**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JERMAINE SPENCER,

       Plaintiff,

          v.

DONALD MORGAN, et al.,

       Defendants.

Case No. 1:14-cv-696

Barrett, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

### I. Background and Pending Motions

Plaintiff, presently incarcerated at the Southern Ohio Correctional Facility and proceeding *pro se*, has filed a civil rights action. On September 29, 2014, the undersigned recommended the dismissal of some of Plaintiff's claims, while permitting Plaintiff's claims under the Eighth Amendment for excessive force and/or failure to protect, a claim of deliberate indifference to serious medical needs, and a due process claim to proceed against eight Defendants. *See generally* 28 U.S.C. §§1915(e) and 1915A. All of Plaintiff's claims arise out of events that occurred during his incarceration at the Southern Ohio Correctional Facility. (*See* Doc. 4, Report and Recommendation ("R&R").)

Following review of Plaintiff's objections, the presiding district judge modified the R&R in part to permit Plaintiff's claims to proceed against one additional correctional officer as to whom the undersigned had recommended dismissal, but overruled all other objections. Therefore, Plaintiff's case was ordered to proceed on the following claims: "(1) Eighth Amendment claims for excessive force and/or failure to protect against

defendants Michael Anderson, Daniel Baker, Shawn Miller, Matthew Chaffin, Michael Jenkins, and Missy Cambell; (2) the claim for deliberate indifference to serious medical needs against defendant Nurse Jenkins; and (3) the due process claims against defendants Donald Morgan and Larry Green in connection with his RIB proceeding and OSP transfer." (Doc. 36, PageID 269 n.2.)  Plaintiff's claim against Nurse Jenkins was subsequently voluntarily dismissed by Plaintiff through amendment to his complaint. (Doc. 49, PageID 337 ¶ 1.)

On February 29, 2016, Defendants Michael Anderson and Daniel Baker filed a motion for summary judgment.  (Doc. 57.)  On March 7, 2016, Defendants Larry Greene[1] and Donald Morgan filed a motion for summary judgment, (Doc. 60), and on March 9, 2016, all remaining Defendants (Missy Campbell,[2] Matthew Chaffin, Michael Jenkins, and Shawn Miller) filed a third motion for summary judgment, (Doc. 62). Plaintiff filed responses to all three pending dispositive motions, to which Defendants filed reply memoranda.  Plaintiff also filed two motions seeking preliminary injunctive relief.  (Docs. 65, 75.)

The Plaintiff's two motions for preliminary injunctive relief will be discussed first, followed by separate discussions of each of the three motions for summary judgment.

## II.  Plaintiff's Motions for Preliminary Injunctive Relief

On April 1, 2016, Plaintiff filed a motion seeking injunctive relief in the form of an order directing a non-party at SOCF from imposing any limitations on his access to the law library and/or to notary services. (Doc. 65.)  Plaintiff contends that he requires injunctive relief because the conduct of a law library employee "extremely hinders the

---

[1] Plaintiff identified the Defendant's last name as "Green" but it is spelled "Greene" by defense counsel. For the convenience of the Court, the spelling "Greene" will be used in the remainder of this R&R.
[2] Plaintiff identified the Defendant's last name as "Cambell," but it is spelled "Campbell" in the record.  For the convenience of the Court, the spelling "Campbell" will be used in the remainder of this R&R.

Plaintiff's ability to meet legal time tables." (Doc. 65, PageID 784.) On May 13, 2016, Plaintiff filed a second motion seeking preliminary injunctive relief, (Doc. 75), to which Defendants have filed a response, (Doc. 76). Although Plaintiff's reply time has not yet expired, the undersigned has included limited discussion of that motion.

The State of Ohio, acting as an "interested party," filed a response in opposition to Plaintiff's first motion. (Doc. 67.) In that response, counsel points out that Plaintiff's motion seeks injunctive relief against three persons or entities who are not identified as Defendants to this lawsuit: (1) "SOCF Legal Library Staff," (2) "Ms. Aldridge," and (3) SOCF Administration." (*Id.*, PageID 790.) The Plaintiff's motion generally alleges that prison staff unfairly placed Plaintiff on restricted library privileges for a period of 14 days in March, and that Ms. Aldridge in particular has "continuously denied" Plaintiff full access to library materials as "retaliatory tactics" which "may" cause Plaintiff to lose his underlying civil rights case. (Doc. 65, PageID 783-84.)

The State argues that Plaintiff does not specifically allege actual prejudice. However, one of Plaintiff's primary complaints is that SOCF staff, including Ms. Aldridge, have refused to notarize Plaintiff's affidavit or the affidavits of supporting witnesses in connection with this case. (Doc. 65, PageID 783.) Considering that Defendants' pending dispositive motions seek to exclude most of those same affidavits because they are not notarized or properly sworn,[3] and further considering that Defendant relies on the presumed exclusion of the affidavits to assert the lack of any genuine dispute of material fact, the undersigned finds that Plaintiff has reasonably alleged actual prejudice.

---

[3] Plaintiff alleges a refusal to notarize Plaintiff's own affidavit submitted in opposition to Defendants' motions as well as those of other inmates. (Doc. 65, PageID 783.) As Defendants observe, Ms. Aldridge's refusal to notarize signatures would be proper if the inmates were not before her at the time notarization was sought. (Doc 67, PageID 795.)

Nevertheless, Plaintiff's ability to access this Court has not been completely foreclosed. Plaintiff sought and was granted several extensions of time in which to file responses to Defendants' motions for summary judgment. (*See* Docs. 63, 64, 66.) In his last such motion, Plaintiff sought an extension due to a health issue. (Doc. 66.) Ultimately, Plaintiff timely filed extensive responses in opposition to all three of Defendants' dispositive motions. *See generally Lentz v. Loxton*, 2013 WL 449907 (E.D. Mich. Feb. 6, 2013) (denying injunctive relief prohibiting interference with legal mail, because unrelated issues arose after events that formed subject matter of complaint, noting that "the plaintiff has been able to file numerous pleadings and documents with this Court," such that it did not appear that plaintiff had been prejudiced).

"[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Colvin v. Caruso,* 605 F.3d 282, 300 (6th Cir. 2010) (internal quotation omitted). Courts have denied preliminary injunctive relief where the requisite connection is lacking between the non-parties against whom injunctive relief is sought, and the underlying claims. *See generally Barnes v. Morgan*, 2012 WL 147948 at *9-11 (S.D. Ohio Jan. 18, 2012) (R&R recommending that injunctive relief against non-party SOCF employees be denied as unrelated to claims against parties in complaint, adopted at 2012 WL 8688997); *Corsetti v. Hackel*, 2012 WL 4955275 (E.D. Mich. Sept. 26, 2012) (holding that plaintiff's recourse was to file a new lawsuit for his new claims). The facts herein, however, present a close issue—particularly with respect to Plaintiff's affidavit in opposition to summary judgment, which Defendants seek to exclude based upon the lack of notarization that Plaintiff argues he has been prevented from obtaining.

4

The traditional four factors used in determining whether injunctive relief should be granted are:

1. Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

2. Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

3. Whether an injunction will cause others to suffer substantial harm; and

4. Whether public interest would be served by a preliminary injunction.

*See Procter & Gamble v. Bankers Trust Co.*, 78 F.3d 219, 226-27 (6th Cir. 1996); *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 102-03 (6th Cir. 1991).

The purpose of a preliminary injunction is to maintain the relative positions of the parties until proceedings on the merits can be conducted. *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981).  "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *See Overstreet v. Lexington-Fayette Urban County Government,* 305 F.3d 566, 573 (6th Cir. 2002). When an injunction is sought by an inmate against state prison officials, the Sixth Circuit has noted that findings of fact in support of any granted relief are "especially critical" since such an order would necessarily intrude "significantly into the prerogatives of state correctional officials." *Glover v. Johnson,* 855 F.2d 277, 284 (6th Cir. 1988); *see also Kendrick v. Bland,* 740 F.2d 432, 438 n.3 (6th Cir. 1984) ("[W]here state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities").

Plaintiff's April motion states that Ms. Aldridge refused to notarize affidavits in opposition to summary judgment. (Doc. 65.)  His May motion includes evidence of "14

5

days library rest" from March 9, 2016 through March 23, 2016, for an unstated rules violation, and contains allegations of additional, multiple, and serious examples of retaliatory conduct allegedly taken against Plaintiff by SOCF officials, including some of the Defendants herein.    (Doc. 75.)    Considering all factors, including the strong institutional policies that disfavor granting injunctive relief that has potential to interfere with prison administration, the undersigned will recommend the denial without prejudice of Plaintiff's <u>first</u> motion for injunctive relief.  At the same time, the motion will be denied without prejudice in light of the serious and concerning nature of the allegations made in Plaintiff's more recent May motion for injunctive relief.

Additionally, and as discussed below, the denial is conditioned on this Court's consideration of Plaintiff's unsworn affidavit in opposition to the pending dispositive motions.  By considering the affidavits submitted—particularly Plaintiff's own affidavit— the Court avoids any actual prejudice to Plaintiff that might otherwise result from the denial of preliminary injunctive relief.

### III.  Standard of Review and Admissibility Questions Pertaining to Defendants' Motions for Summary Judgment

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden of showing that the non-moving party's case lacks

6

sufficient evidence to proceed to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the moving party meets its burden of production, then the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-49. The mere existence of a scintilla of evidence to support the non-moving party's position is insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 251-52.

### B. Admissibility of Affidavit and other Evidence Submitted by Plaintiff in Response to Defendants' Motions

As referenced above, prior to addressing the merits of the pending motions for summary judgment, the undersigned must resolve a preliminary question presented by several Defendants, pertaining to whether this Court can or should consider the exhibits attached to Plaintiff's separate responses. Defendants urge this Court to disregard all of Plaintiff's exhibits as not properly authenticated.[4] While Defendants are willing to forego a challenge to documents that are duplicates of Defendants' exhibits, Defendants particularly object to the submission of a lengthy affidavit by Plaintiff. (*E.g.,* Doc. 73, PageID 1323-24.)

Under Rule 56(c)(2), a party may object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Here, Defendants do not directly contend that the Plaintiff's exhibits could *never* be presented *at trial* in a form that would be admissible, nor do they otherwise directly challenge the authenticity or legitimacy of any of Plaintiff's evidence. Defendants also

---

[4] The issue is presented most forcefully in the reply memorandum of Defendants Greene and Morgan in support of their motion for summary judgment. (Doc 73, PageID 1320-25.)

do not contend that Plaintiff's affidavit contradicts any prior sworn statement by Plaintiff, nor do they challenge Plaintiff's competency to testify.  However, once a party has challenged evidence submitted in support or in opposition to summary judgment, "[t]he burden is on the proponent to show that the material is admissible as presented *or to explain the admissible form that is anticipated*."  Fed. R. Civ. P. 56(c) (Advisory Committee Notes, 2010 Amendment) (emphasis added).

Defendants object to this Court's consideration of any documents that are captioned as "affidavits" based upon the technical deficiencies of those statements, including the fact that several (including Plaintiff's) are undated and/or lack the requisite notarization or a statement by the Declarant that the declaration is made "under penalty of perjury."  Despite being captioned as an "affidavit" and bearing Plaintiff's hand-written full name and a signature line, Plaintiff's statement is unsigned.[5]  (*E.g.*, Doc. 70, PageID 1297.) Plaintiff's responsive memorandum, to which his exhibits are attached, is signed. (*E.g.*, Doc. 70, PageID 1125.)

In general, the Sixth Circuit has held that unsworn affidavits should not be considered on a motion for summary judgment.  *Sigier v. Am. Honda Motor Co.*, 532 F.3d 469, 481 (6th Cir. 2008).  Defendants protest that under this general case law, the undersigned should disregard virtually all exhibits attached to Plaintiff's responsive memoranda.  While the Defendants point to no prior inconsistent statements, they do argue that by providing additional details, Plaintiff appears to be "attempt[ing] to cure…deficiencies in his pleading" such as Plaintiff's initial failure to allege that his transfer to OSP resulted in "atypical hardship."  (Doc. 73, PageID 1321.)

---

[5] Plaintiff's full name and prisoner number are printed—presumably by Plaintiff—just below a signature line and the statement "Affiant further sayeth naught."  The month and year of "April 2016" are stated with the date left blank for the signature of a notary, which Plaintiff alleges was refused by prison officials.

The undersigned does not find the affidavit to be inconsistent with Plaintiff's complaint, or that Plaintiff's affidavit was written in a manner designed to cure deficiencies in his complaint. On the whole, the undersigned finds Plaintiff's responsive memoranda and exhibits to properly respond to the legal issues presented by Defendants in their pending motions for summary judgment.

In addition, and contrary to Defendants' argument, Plaintiff's initial sworn and verified complaint alleges that Defendants created an "'atypical' hardship" when they affirmed all RIB penalties, which resulted in his transfer to OSP. (Doc. 3, PageID 78 ¶ 6.) On initial screening, the undersigned interpreted the complaint as alleging that the hardship included the 15 days of disciplinary control, local control, 4B/5B status upgrade, and transfer to the Super Maximum Security facility. (Doc. 4, PageID 124.) Rule 8 requires only notice pleading. The inference that Plaintiff's security status was upgraded without his knowledge (or a hearing that would have provided him with knowledge) is reasonably drawn from Plaintiff's allegation that it was not until November 2013 at OSP that Plaintiff learned that his security status had been raised to 4B. (*Id.*) Plaintiff also included an allegation that Defendants knew that the language used in the disciplinary proceedings was "certainly likely to be considered by the parole authorities and cause serious collateral consequences at the Plaintiff's parole hearing." (Doc. 3, PageID 78.) Thus, the undersigned previously interpreted that allegation as a claim that the charges would adversely impact his eligibility for parole. (Doc. 4, PageID 125.) Plaintiff obviously could not have included allegations concerning any specific consequences when his parole hearing had not been held at the time he filed his complaint.

The fact that Plaintiff initially included the "under penalty of perjury" language in his sworn and verified complaint helps to inform the Court's analysis.

> However, a prisoner may show the existence of a genuine issue of material fact if he submits statements which were subscribed to as true under penalty of perjury….*Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994–95 (8th Cir. 2001) ("Although a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion."). Because inmate Solomon's statement complies with this requirement, Defendants' contention that it should not be considered lacks merit.

*Perkins v. McCarthy*, No. 2:11-CV-23, 2013 WL 5329849, at *6 (W.D. Mich. Sept. 23, 2013).  While Defendants protest that Plaintiff should have included the same "under penalty of perjury" statement as part of his Affidavit/Declaration, the undersigned cannot wholly put aside the fact that Plaintiff is a *pro se* prisoner with limited access to the law, who may not have been cognizant of the option of submitting a Declaration rather than a formal Affidavit.

In short, the undersigned declines to disregard Plaintiff's presently unsworn affidavit or other exhibits solely on the basis of technical deficiencies at this time. Plaintiff has asserted that prison officials have refused to notarize his affidavit.  This is not a case in which Defendants contend that the unauthenticated documents, such as copies of correspondence to/from Plaintiff's former attorney or Corrections Department officials, are fabricated. In light of the unique circumstances presented herein, the undersigned finds the exhibits attached to Plaintiff's response—while not currently in a form that would be admissible—are likely to be presented in a form that will be admissible at trial through the testimony of Plaintiff and other witnesses.  Should a reviewing court disagree with the consideration of Plaintiff's unsworn affidavit in particular, the undersigned would recommend that Plaintiff be provided some

opportunity to cure the technical deficiency by submitting a signed and dated certification that verifies and reaffirms the statements in the prior April 2016 "affidavit" as made under penalty of perjury pursuant to 28 U.S.C. §1746.

### IV. Three Motions for Summary Judgment

Three groups of Defendants have filed separate motions for summary judgment. Because the claims against each group of Defendants are distinct, as are the facts relating to those claims, each motion has been separately addressed.

### A. Motion by Anderson and Baker

Defendants Michael Anderson and Daniel Baker filed a motion for summary judgment on February 29, 2016. (Doc. 57.) The undersigned recommends that the motion of these two Defendants be granted.

#### 1. Undisputed Facts Concerning Baker and Anderson

Plaintiff's allegations against Correctional Officers Anderson and Baker are set forth at pages 6-9 of his original complaint. (Doc. 3, PageID 70-73.) To the extent any facts are disputed, all reasonable inferences have been construed in favor of the Plaintiff.

The incident that forms the basis of this lawsuit began on May 14, 2013, at approximately 9:05 p.m.,[6] when Plaintiff was housed in Unit L-5, cell #63. Correctional Officer Anderson was on the L-5 unit, while Officer Baker was in the control booth. It was a hot evening, approximately 87 degrees, but ice had been provided by Defendant Correctional Officer Anderson only to four inmates identified as "porters." Plaintiff asked Officer Anderson why ice had not been given to everyone, including Plaintiff. Anderson directed Correctional Officer Baker, who was in the control booth, to open Plaintiff's cell

---

[6] Whether the incident began before or after "lock down" is disputed, but Plaintiff's evidence is credited for purposes of the pending motion.

so that he could speak face-to-face with Plaintiff.[7] At the end of their exchange, Plaintiff asked to be transferred to a different cell block. Anderson refused the request and instructed Baker to "close the door I'm done with this bitch." (Doc. 68-1, PageID 948).

Anderson left Plaintiff's cell and began to walk away. For reasons that remain disputed,[8] Anderson turned back and directed Baker to re-open the cell door. During this second interaction, Anderson ordered Plaintiff to exit his cell and proceed to the shower, which was physically located next to a flight of stairs. In his affidavit, Plaintiff states that while still several feet away from the shower Anderson placed his hands in the middle of Plaintiff's back and began pushing Plaintiff forcefully forward in the direction of the stairs/shower, leading Plaintiff to fear that Anderson intended to push him down the stairs. Plaintiff stopped short of the shower/stairs area and "turned and stood his ground." (Doc. 68-1, PageID 949.) In Anderson's account, Anderson placed his hands on Plaintiff only when the two reached the entrance of the shower, and Plaintiff stopped. (Doc. 57-7, PageID 522 ¶ 15.) Anderson avers that he placed his hands on Plaintiff's back and shoulder to "encourage" Plaintiff to comply with his order to proceed into the shower. (Doc. 57-7, PageID 523 ¶ 20.)

At approximately the same time that Plaintiff turned to face Anderson, Anderson slipped and fell backwards, striking his head.[9] (Doc. 18, PageID 184 ¶ 27.) Defendant Anderson states that Spencer pushed back against Anderson's hands on Spencer's

---

[7] Anderson contends that he made the request in order to better hear Plaintiff. (Doc 57-7, PageID 520 ¶ 10.) Plaintiff alleges that Anderson entered his cell as part of a common practice of showing authority and/or intimidation. (Doc. 68, PageID 801.) Anderson's motivation is not material for purposes of the pending motion.

[8] Anderson avers that he returned because he heard Plaintiff yell out: "You do know there is a piece of steel missing from the staff restroom," (Doc. 57-7, PageID 520 ¶ 11), but Plaintiff denies ever making that statement or any similar statement, (Doc, 68, PageID 804-05 ¶ 2). Plaintiff maintains that Anderson returned because he was angry from the initial exchange and determined to punish Plaintiff. (Doc 68, PageID 801.)

[9] It appears that Anderson fell once, got up briefly, and fell a second time, striking his head. However, the undersigned does not find any dispute as to the number or sequence of falls to be material at this time.

back, and suggests that he fell as a result of being startled by Spencer's "aggressive" turn toward him, although he also states he slipped when he stepped back and lost his footing on wet flooring. (*Id.*, ¶ 30.)  In his Answer, Anderson states that when Spencer turned, "Officer Anderson attempted to exert physical control over Inmate Spencer by placing him against a wall and in that attempt, slipped on the wet tile floor and fell to the ground striking his head. (*Id.*, ¶ 27.)   Defendants admit that Inmate Spencer 'did not shove, hit or attack the Defendant Officer Anderson.'" (*Id.*)  In a May 30, 2013 interview, Plaintiff stated, "I did spin away from him and he did fall to the floor" but denied taking any physical action to harm Anderson.  (Doc. 57-2, PageID 381.)

As a result of his fall, Anderson's PR-24 baton became dislodged from his duty belt. (Doc 18, PageID 184 ¶ 30.)  Anderson also momentarily lost consciousness.[10] Plaintiff stood above the Defendant and yelled at Anderson to "keep his hands off of me." (Doc. 68-1, PageID 950.)  When Anderson reached to regain control of his PR-24 baton, Plaintiff "reached down and pushed the stick away from his grasp," allegedly out of concern for Plaintiff's safety. (*Id.*) Anderson grabbed Plaintiff's leg, and according to Plaintiff, continued to try to "flip" Plaintiff down the stairs. (*Id.*)   Plaintiff admits defensively pushing against Anderson's shoulders while he was down, in order to prevent him from getting up. (*Id.*)  By this time, Baker had set off a "man-down" alarm from his position in the control booth, and multiple officers responded, directing Plaintiff to back away. (Doc. 62, PageID 607-08.)

Plaintiff alleges that the responding officers used excessive force against him in subduing him. (*See* Doc. 70, PageID 1110.) After he was subdued, he alleges several Defendants (not including Baker or Anderson) roughly escorted him through the "L-Side

---

[10] Anderson was driven to a nearby hospital where he was diagnosed with a closed head injury with loss of consciousness, treated and released.  He returned to SOCF where he completed an incident report at approximately 3:00 a.m. on May 15, 2013. (Doc. 57-7, PageID 522-23 ¶¶ 17-19.)

hallway attempting to break the Plaintiff's wrist with their PR24 sticks," and made up a story that he was continuing to resist and that he was suffering from chest pains as a ruse to transport him to an Infirmary exam room without cameras. (Doc. 3, PageID 72 ¶¶ 18-19.) Once there, he alleges that officers (again, not including Baker or Anderson) beat him while using racial slurs, in retribution for what they perceived as Plaintiff's attack on Anderson.  (*Id.*, PageID 73 ¶¶ 24-25.)

Only one video was retained of the incident, and that was from a single fixed camera at the farthest end of the L range at SOCF, pointed in the general direction of the shower/stairwell at the other end of the range where the altercation began. (Doc. 42, PageID 325.)  Only the first minutes of the altercation between Anderson and Plaintiff, and continuing through the time that responding officers first subdued and handcuffed Plaintiff, is captured on the DVD filed on record.  No close-range video image of that initial altercation was retained.  Additionally, no video was retained of the "L-side hallway" at SOCF where Plaintiff alleges he was abused during his escort to the Infirmary, and no video was retained of the infirmary where Plaintiff alleges he was beaten and threatened. (Doc. 42, PageID 325.)  The hallway and Infirmary videos, to the extent that they ever existed, are irrelevant to Plaintiff's claims against Baker and Anderson because Plaintiff does not allege that either Baker or Anderson took any action after the initial few minutes.[11]

---

[11] Defense counsel acknowledges the existence of three video cameras that presumably would have recorded the initial interaction with Anderson, despite the retention and transmission to counsel of only a single recording.  (Doc. 42, PageID 326.)  Officer Miller similarly admits that there were two L-5 range cameras and a third L-5 camera in the bullpen.  (Doc. 62-5, PageID 718.)   Miller admits that there are additional L-side hallway cameras but denies knowledge as to how many were installed and operating on May 14, 2013.  (*Id.*)  Defendant Chaffin states that there "may be as many as five working cameras in the L-Side Hallway."  (Doc. 62-7, PageID 731.)  Defendant Campbell also admits there are cameras in the L side hallway, as well as cameras in the Infirmary, but denies knowledge as to whether such cameras existed on May 14, 2013.  (Doc. 62-9, PageID 748.)  Defendant Chaffin states that Plaintiff was "taken to the Infirmary where cameras and 12 or more nurses and security staff were present."  (Doc. 62-8; PageID 745.)  Officer Jenkins states that in May 2013, "there may have been a camera over the top of the

In addition to being from a significant distance, the single retained video image of the fracas with Anderson is extremely poor in quality.  The time stamp of the video reflects 9:29:03 pm until 9:37:14 p.m., a total elapsed time of eight (8) minutes and eleven (11) seconds, though the relevant portion is closer to four minutes.  Defendants have submitted the affidavit of a records custodian who states that, while the basis for the discrepancy between the time stamp on the video and Defendants' account (which placed the time of the incident much earlier, prior to lock-down) remains unclear, it is possible that the discrepancy was caused by "difficulties…in getting the server to synchronize each and every camera with the actual time of day."  (Doc. 62-3, PageID 711 ¶¶ 8-9.)   The same affiant acknowledges that "there are three (3) brief segments where *inexplicably* the screen darkens and it is difficult to view the activity on the viewing screen." (Doc. 62-3, PageID 712  ¶ 11, emphasis added.)

Three days after the incident with Anderson, Plaintiff was found guilty of three disciplinary offenses by the Rules Infraction Board ("RIB"):   Rule 1 (causing or attempting to cause the death of another);[12] Rule 3 (causing or attempting to cause serious physical harm to another); and Rule 20 (physical resistance to a direct order).  (Doc. 3-1, PageID 100.)   At the hearing, Plaintiff made the following statements regarding what happened immediately after Anderson fell:

> I leaned forward.   The other C/O's came and sprayed me.   I had an opportunity to step away from him but I didn't make an aggressive move toward him.   My hands were on him when he was using his weight to push me back.   I was afraid I would go over the range.   I was looking out for

---

doorway leading into the Infirmary but it only records the hallway and not the individual examination rooms."   (Doc. 62-11, PageID 762.) Defendant Jenkins subsequently revised that response to deny "actual knowledge" of the presence of any particular cameras in May 2013.  (Doc. 62-11, PageID 767.) In short, the reason for the lack of retention of additional video coverage remains unclear.  The undersigned denied several motions to compel additional video filed by Plaintiff on the basis of counsel's assurances that all retained video was produced. (*E.g.,* Doc. 45.)

[12]  The Rule 1 charge was added by the Hearing Officer, who interpreted Anderson's comments in his initial Conduct Report and Incident Report as supporting that charge.

myself. I can't explain the marks around his neck, my hands were around
his shoulders.

(Doc 60-2, PageID 562.) Plaintiff alleges that eleven inmates submitted statements on

Plaintiff's behalf to Defendants Greene, Morgan, and Captain Distal "by either kite or

when they made rounds after days after the May 14, 2013 incident" but that Defendants

now deny that any inmate wrote statements on his behalf. (Doc. 69, PageID 991.)

In its initial decision finding Plaintiff guilty of all charges, the RIB found that

"Spencer turned on C/O Anderson in an aggressive manner," and that after Anderson

fell to the floor and hit his head on the ground, "Spencer …placed his hands around C/O

Anderson['s] neck and began to apply pressure on his neck." (Doc. 60-2, PageID 563.)

The RIB referenced "pictures which show marks on C/O Anderson's neck, which is

consistent with the officer['s] statement of being strangled." (*Id.*)[13] The RIB imposed as

a penalty "15 days DC [disciplinary control], in 5/17/13 out 5/31/13." (*Id.*) In addition, the

RIB referred Plaintiff for an increase in his security classification "to 4B/LC/5B. This

penalty is being imposed due to the serious nature of the offense." (*Id.*) A disciplinary

level 5 requires transfer to what has been described as a "Supermax" facility, the Ohio

State Penitentiary ("OSP").[14]

Plaintiff appealed his disciplinary convictions on May 20, 2013. (Doc. 3, PageID

74 ¶ 32.) According to Defendants, on May 28, 2013,[15] a date long before the

conclusion of an October 2013 Use of Force investigation, and prior to an addendum

statement submitted by Defendant Anderson in connection with that investigation, the

---

[13] The undersigned assumes the pictures are those filed at Doc. 57-2, PageID 468-470, but the quality of
the pictures is such that the undersigned cannot confirm the existence or absence of any marks.
[14] In objections to Plaintiff's Interrogatories but without elaboration, Defendant Greene asserts that "OSP
is no longer referred to as a 'Supermax' correctional facility." (Doc. 60-4, PageID 577.)
[15] Although Plaintiff points to circumstantial evidence in an attempt to question whether the reversal of the
Rule 1 and Rule 3 convictions actually occurred on May 28, as opposed to some later date, the
circumstantial evidence does not appear sufficient to rebut the documentary evidence submitted by the
Defendants that reflects the May 28, 2013 date.

convictions for the most serious violations (Rules 1 and 3) were vacated by Defendant Greene, leaving only the Rule 20 conviction for physically resisting a direct order (to enter the shower). (Doc. 60, PageID 537-38.)  Plaintiff states he was not timely informed of the May 28 decision and/or deliberately misled by Defendants Warden Morgan and AA Greene, and the penalties remained the same.  Most concerning to Plaintiff was the increase in Plaintiff's security classification, which Plaintiff alleges led both to his transfer to OSP and, more recently, to the denial of parole and to the addition of prison time. (Doc. 69, PageID 985-90 ¶¶ 9-11.)

At first, the Defendants denied altering Plaintiff's security classification in any manner.  In his initial discovery responses, Defendant Greene stated that "neither [security classification or privilege levels]…changed as a result" of the incident.  (Doc. 60-4, PageID 577.)

> There is no evidence in the record at this point in time to demonstrate that Inmate Spencer's security classification was increased as the result of his convictions for the Rule 1, Rule 3, and Rule 20 violations.  <u>Further, any security increase would not have been possible due to the Rule 1 and Rule 3 convictions by the SOCF RIB because I vacated those convictions when I modified the RIB's findings</u>….
>
> In April 2013, while still at SOCF, and well before the May 14, 2013 incident, Inmate Spencer was classified as 4-B, meaning his security classification was Level 4, and his Privilege Level was B.  In June 2013, subsequent to the RIB Convictions and subsequent to the Rule 1 and Rule 3 violations being vacated…, Inmate Spencer was approved for a transfer to OSP…still  as a Level 4 security classification and still at Level B privileges.

(*Id*., emphasis added).

Notwithstanding that initial denial, Defendant Greene subsequently corrected his response:

> Inmate Spencer's privilege level in April, 2013 was Level A, consistent with his being housed in L-5 Block.  My earlier Response to Inmate Spencer's Interrogatory No. 10 incorrectly stated that prior to the May 14,

17

2013 incident with Officer Anderson and the other responding officers Inmate Spencer's Privilege Level was B and that as a result, there had been no change…. However, as a result of the May 14, 2013 incident, although Inmate Spencer's Security Classification Level did not change, his Privilege Level did change from A to B.

(Doc. 60-4, PageID 584 ¶ 6.)    Thus, Defendants now concede that Plaintiff's classification was raised from 4A to 4B on an unknown date prior to his transfer to OSP, as a direct result of his RIB conviction.

The May 14 incident was investigated by the Use of Force Committee, which issued an 84 page report upon completion of its investigation on October 6, 2013. The final report summarized the incident as follows:

On 5/14/2013 Inmate Spencer…assaulted Officer Anderson causing the officer to fall on the floor.  The inmate got on top of the officer and was choking him, responding Officer Miller deployed chemical agent, several responders were required to subdue and restrain the inmate as he remained actively resistant throughout the incident.

(Doc 57-2, PageID 396.)

In Defendant Anderson's original incident report, written hours after the incident, he wrote:

Once at the shower door the I/M stopped. The I/M turned around in an aggressive manner at me.  I reacted by attempting to place the I/M on the wall.  At this point the I/M began to resist my attempts to restrain him.  At this point I grabbed a hold of the I/M.  As I had a hold of the I/M I fell and struck my head, which resulted in me requiring outside medical treatment. After striking my head on the ground the I/M then placed his hands around my neck and applied pressure to my neck.  At this point I do not have full recollection of the rest of the struggle.

(Doc. 57-2, PageID 409.)

On June 1, 2014, during the investigation by the Use of Force, Anderson was asked if his original statement was true and factual.  According to the investigating officer, Anderson

hesitate[d] and ask[ed] if he can rewrite his original statement.  I explained

18

that he can't rewrite his original report but that I would allow him to submit an addendum.  At this time Officer Anderson states that Inmate Spencer's actions along with the wet floor, caused him to fall and inadvertently strike his head on the floor.  Once on the floor Officer Anderson explained that his PR-24 became dislodged…[and] Inmate Spencer impede[d] his ability to regain his footing, by pushing down on the back of his neck.

(*Id.*, PageID 398.)   In a written addendum filed two weeks after his original incident report, Officer Anderson wrote:

After speaking with Captain Lewis I was able to more clearly recall the incident from this night.  After Inmate Spencer exited his cell he started to walk to the shower.  We arrived at the shower door and at this time he refused to get into the shower and turn towards me.  At this point I placed my left hand on his shoulder and right hand in the middle of his back and give him another direct order to get into the shower.  At this time he started to resist by pushing back towards me.  As a result of Inmate Spencer turning around, along with wet floors in front of the shower, my momentum caused me to fall backwards.  Falling backwards caused my head to hit the range floor.  At this time my PR-24 became dislodged from my ring holder and fell to the floor.  From this point I attempted to recover my PR-24 and to stand to my feet.  Inmate Spencer then placed his hands at the back of my neck to impede me from regaining my balance and to stand up.  At this time I fell again and rolled to my back and sat up on my rear end.  At this point responding officers arrived.

(Doc. 58-2, PageID 407.)

In an affidavit submitted in support of his motion for summary judgment, Defendant Anderson explains that "with my head injury my recollections of the preceding [sic] events after this incident are very vague."  (Doc. 57-7, PageID 523 ¶ 19.)  He states that he added the addendum after realizing

that my reports did not match my recollection [once] I had two weeks to fully work through the entire incident.  I realized that there was once [sic] sentence that had been taken out of context which led to Inmate Spencer being charged with a Rule 1 violation (causing, or attempting to cause, the death of another) by the Hearing Officer.  I requested and was allowed to submit an addendum to…clear[] up any ambiguity about the placement of Inmate Spencer's hands around my neck area.

(*Id.*, PageID 524 ¶ 22.)  In other words, the addendum clarified: (1) that Spencer did not push Anderson in a manner that caused him to fall, but instead that Anderson fell as a

result of being startled by Spencer "turning around, along with wet floors"; and (2) that Anderson's perception was that Plaintiff's placement of his hands "at *the back of*" his neck (as opposed to "around" his neck) was not an attempt to choke, injure, or kill Anderson, but instead was done solely to keep him from regaining his feet.  Anderson was issued a written reprimand for using poor judgment in not securing Spencer in restraints prior to removing him from his cell and taking him to the shower. (*Id.*, ¶ 23.)

Plaintiff complains that the May 14 incident reports and Use of Force report, including language drawn from the initial Rule 1 and Rule 3 charges, plus the first report written by Anderson (prior to his addendum) were used to adversely impact both his security/privilege levels and—of great import to Plaintiff—a recent adverse parole decision.  (*See, e.g.,* Doc. 57-2, PageID 475, May 13, 2015 report of Capt. Distal (incorrectly) stating that Plaintiff "did physically assault a staff member by striking him with a closed fist and did choke the officer until responders took control of the inmate"; Doc. 57-2, PageID 461, (incorrectly) stating Plaintiff is a "known gang affiliation" who used a "chokehold.")  Plaintiff states that on November 30, 2015, Plaintiff was "issued [an additional] 9 yrs 9 months after serving 20 years" by the Parole Board as a result of reliance on false reports concerning the incident. (Doc. 69, PageID 988; Doc. 69-1, PageID 1051.)

Soon after the May incident, Plaintiff retained an attorney, Byron Potts, "to look into the incident which resulted with [Plaintiff] being assaulted by the guards and eventually transferred to OSP."  (Doc. 3-1, PageID 95.)  Correspondence from Mr. Potts to Plaintiff and to corrections institution officials reflects Mr. Potts' belief that Plaintiff was transferred to OSP as a "temporary" transfer for his safety, and refers to an ongoing investigation into the incident by the Ohio State Highway Patrol.  (Doc. 3-1, PageID 81,

July 30, 2013 letter from Potts reassuring Plaintiff that "[y]our assault charges against Correctional Officer Anderson will be dropped and you are at OSP due to the fact you are a temporary transfer.")

### 2. Legal Grounds Support Judgment in Favor of Baker and Anderson

### a. Lack of Disputed Issues of Material Fact

At least as to Plaintiff's claims against them, Defendants Baker and Anderson have adequately demonstrated a lack of any genuine dispute in material facts,  The only actions taken by Officer Baker were from the confines of the control booth, and involved complying with Anderson's request to open Plaintiff's cell door, and later summoning help for Anderson.

Plaintiff's Eighth Amendment claim against Officer Anderson is based upon his assertion that Anderson was verbally disrespectful and physically "attacked" him in a "wanton" display of excessive force. (Doc. 3, PageID 77-78 ¶ 4.) Plaintiff alleges that Anderson "was deranged and displayed a clear purpose of hurting the plaintiff" who "only stood his ground to prevent being physically harmed."  (*Id.,* PageID 78 ¶ 5.)  Thus, Plaintiff alleges that his own physical actions were undertaken in self-defense based upon Plaintiff's perception that Anderson intended to cause Plaintiff harm. (*Id.*)

In his response in opposition to the Defendants' motion, Plaintiff highlights several disputed issues that he asserts preclude summary judgment.  None, however, are material to the legal issues presented.  For example, Plaintiff points to the time stamp on the lone video record, emphasizing that the time of Anderson's entry into Plaintiff's cell was *after* lock down in violation of institutional rules, rather than prior to lock down as claimed by Defendants. (Doc. 68, PageID 803-04 ¶ 1.) Plaintiff also points to evidence that he argues undermines Defendants' account that Anderson heard

Plaintiff yell something about a missing piece of metal from the staff bathroom, and makes more credible Plaintiff's account that Anderson made up that story in order to remove Plaintiff from his cell. (*Id.*, PageID 804-05 ¶ 2.)

Plaintiff also complains he was permitted to review the video footage only briefly, in violation of the express directives of this Court and of defense counsel. (*Id.*, PageID 807 ¶ 4.) As mentioned, the video footage is of extremely poor quality and contains three 8-second periods in which the screen flickers to dark. Plaintiff speculates that more accurate footage than that which has been filed of record contributed to overturning Plaintiff's convictions on Rule 1 (attempt to kill) and Rule 3 (assault) charges. (*Id.*, PageID 808-09 ¶ 5.) He suggests that the missing footage may support his claims. (*Id.*, PageID 809 ¶ 6.)

Finally, Plaintiff complains that the institution refused to send his mail to his former attorney, Byron Potts, who was retained to investigate the incident, that witnesses including himself "have been denied notarization of affidavits," and that Anderson bribed another inmate to stab Plaintiff days after Plaintiff was transferred back to SOCF in November 2015, in retaliation for this lawsuit. (*See, e.g.*, Doc. 75, PageID 1341.) In his affidavit, Plaintiff similarly states that on November 22, 2015, "an attempt was maded [sic] on my life by an inmate Leon Thomas who I've found out he was paid by 'now' case manager Michael Anderson cigarettes to harm me with a 10" inch shank." (Doc. 69-1, PageID 1051.) Plaintiff alleges his personal property was also taken and destroyed in retribution. (Doc. 68 PageID 810-11; Doc. 75, PageID 1343-44.)

None of the referenced disputed issues can overcome the pending motion for summary judgment. Even if Plaintiff's allegations are true, the disputed facts simply are not material to the Eleventh Amendment and qualified immunity defenses presented in

Defendants' motion.

### b. Official Capacity Claims

Both Defendants Baker and Anderson are entitled to judgment as a matter of law for Plaintiff's claims against them in their official capacities for monetary damages. When a state official is sued in his official capacity for acts performed within the scope of his/her authority, such a suit is equivalent to a suit against the state itself. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). The State of Ohio has not waived its Eleventh Amendment immunity; therefore, the Eleventh Amendment bars Plaintiff's claims for money damages against both Defendants in their official capacities.

### c. Qualified Immunity

The undersigned further finds that Baker and Anderson are entitled to qualified immunity for Plaintiff's claims against them in their individual capacities. The purpose of qualified immunity is to provide governmental officials with the ability "reasonably to anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (internal quotation omitted). Thus, a governmental official performing discretionary functions will be entitled to qualified immunity unless his or her actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223 (2009).

When a defendant moves for summary judgment based on qualified immunity, the official must first show that he acted within discretionary authority. *Gardenhire v.*

*Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Once an official makes this showing, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established that any reasonable official in that position would have understood it was unreasonable to engage in the conduct that violated the right. *Id.* Here, Plaintiff has made no claim that either Defendant was acting outside his authority, so the burden falls on Plaintiff to overcome the qualified immunity defense.

Defendant Baker used no force upon Plaintiff at all. Plaintiff's sole claim against Baker asserts liability for failing to protect him from Anderson, based upon Baker's subjective awareness that Anderson was "irate" when he asked Baker to open Plaintiff's cell door. (Doc. 68, PageID 809-10 ¶ 7.) However, the sole actions taken by Baker were to open the door at Anderson's direction, and to summon assistance for Anderson when he observed that he had fallen, with Inmate Spencer standing over him. It was reasonable for Baker to comply with Anderson's directive to open Plaintiff's cell door in order for Anderson to remove Plaintiff from his cell. When Anderson first removed Plaintiff from his cell, he did nothing other than direct Plaintiff to the shower. Verbal "disrespect" cannot violate the Eighth Amendment. There are no facts to suggest that Baker knew of any imminent attack upon Plaintiff, or that he did anything with intent, knowledge, or even suspicion that other officers would later cause Plaintiff harm. Thus, Plaintiff has failed to prove that Defendant Baker violated any clearly established right, such that a reasonable officer would have understood it was a violation of the Eighth Amendment to open Plaintiff's cell door, or to later summon help for Anderson.

Defendant Anderson also is entitled to qualified immunity. Even accepting Plaintiff's allegations, at most Anderson began to push Plaintiff toward the shower when the two were a few feet away. Plaintiff's fear that Anderson intended to push him not

into the shower as directed, but instead down an adjacent flight of stairs, is not sufficient to show an Eighth Amendment violation on the facts presented.  The undisputed facts are that near in time to Anderson pushing Plaintiff forward toward the shower, Plaintiff spun around and Anderson slipped and fell, striking his head. Plaintiff then physically prevented Anderson from regaining his feet, and deliberately pushed Anderson's dislodged PR-24 baton out of Anderson's reach while the officer was prone on the ground.  To the extent that Plaintiff alleges that Anderson grabbed his leg during the subsequent scuffle, and attempted to "flip" him, that force cannot as a matter of law be said to be in violation of the Eighth Amendment.  In fact, the record reflects that all of the force applied by Anderson was *de minimis*.  As the Supreme Court has explained, "whenever prison officials stand accused of using excess physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*; whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, *v. McMillian*, 503 U.S. 1, 6-7 (1992); *Wilkins v. Gaddy,* 559 U.S. 34, 38 (2010) ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts."); *see also Shreve v. Franklin County, Ohio*, 743 F.3d 126 (6th Cir. 2014) (describing excessive force standard in a "rapidly evolving, fluid and dangerous" situation in which officials attempted to wrestle detainee to the ground to handcuff and restrain him).

Regardless of what Plaintiff believed to be Anderson's subjective intent, Defendant Anderson's actions were objectively reasonable, using minimal force in a manner that caused Plaintiff no real injury *from Anderson*.  An Eighth Amendment claim requires a prisoner to satisfy both an objective component, which requires the pain that is inflicted to be "sufficiently serious," and a subjective component, which focuses on the

state of mind of the prison official.  *See Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citations omitted).  While it is unnecessary for an inmate to prove that he suffered from any significant injury requiring medical attention in order to prove the objective component of an Eighth Amendment claim, *see Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010), the extent of injury is one factor to be considered in determining whether the assertion of force "'could plausibly have been thought necessary' in a particular situation." *Id.,* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  Thus, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. at 9.  The Eighth Amendment's "prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins*, 559 U.S. at 38 (quoting *Hudson*, 503 U.S. at 9).

Plaintiff admits that he stopped short of the shower he had been directed into, and spun around contrary to Anderson's direct order. (Doc. 3, PageID 71.)  Plaintiff admits preventing Anderson from regaining his PR-24 baton, and attempting to keep Anderson from regaining his feet. (*Id.*, PageID 71-72.)  "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. at 37-38 (internal citations omitted); *see also generally Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (suggesting that qualified immunity would be appropriate for use of mace to compel compliance with order). The only physical action taken by the incapacitated Anderson was allegedly grabbing Plaintiff's leg, a tactic that was objectively reasonable under the circumstances. (Doc. 3, PageID 71.) In the end, it was not Anderson's actions that allegedly caused Plaintiff harm, but alleged actions by Anderson's fellow officers. (*Id.*,

PageID 72.)

### d. *Heck v. Humphrey*

Defendants Baker and Anderson argue that they are alternatively entitled to summary judgment based upon the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), because Plaintiff's RIB conviction for the Rule 20 violation—physical disobedience to Anderson's direct order to enter the shower—was upheld. (Doc. 57, PageID 385.) Because Defendants are entitled to summary judgment on other grounds, the undersigned finds no need to reach this alternative argument.

### B. Motion for Summary Judgment by Defendants Morgan and Greene

Defendants Michael Morgan, former Warden of SOCF, and Larry Greene, his administrative assistant ("AA"), filed a motion for summary judgment on March 7, 2016. (Doc. 60.)   The undersigned recommends that Morgan and Greene's motion for judgment be only partially granted.

### 1.   Findings of Fact Regarding Defendants Greene and Morgan

After Plaintiff was initially convicted of three offenses, including the Rule 1 and Rule 3 violations that were subsequently vacated, the RIB imposed a severe penalty, including a referral for review of Plaintiff's security classification to "4B/LC/5B" based upon "the serious nature of the offense." (*Id.*, PageID 537.) A security classification increase to "5" would have required a mandatory transfer to OSP, described as a Supermax prison facility with conditions "more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units," the latter of which are "a highly restrictive form of solitary confinement." *See Wilkinson v. Austin*, 545 U.S. 209, 214 (2005).  Importantly, Plaintiff's classification was not increased to a Level 5. (Doc. 60, PageID 538.)    However, Plaintiff's

classification was changed from a Level 4A to a Level 4B, resulting in a reduction of privileges, and he was transferred to OSP. (*Id.*, PageID 538-39.)

According to Defendants, Plaintiff waived the customary 48 hours prior notice and waived his attendance at the subsequent Local Control security placement hearing on which his classification was changed from 4A to 4B.[16] (*Id.* PageID 537.) However, Plaintiff denies any waiver and the undersigned finds a genuine dispute of material fact exists concerning this issue. (Doc. 69, PageID 979-80.) On a May 17, 2013, "Notice of Hearing Local Control Placement" form that was provided to Plaintiff upon his RIB convictions, Plaintiff was notified that he had been referred for a security review to determine if his "presence in the general population is likely to seriously disrupt the orderly operation of the institution," based upon the following conduct: "You physically resisted and [sic] officer and then assaulted him by putting your hands on his neck and applying pressure to it." (Doc. 60-2, PageID 564.) Plaintiff's initials reflect that he refused to waive his right to 48 hours' notice prior to his security placement hearing, and further refused to waive his right to attend the classification hearing. (Doc. 60-2, PageID 564.) Plaintiff's affidavit also denies signing a waiver of his attendance at the security classification review hearing. (Doc. 69-1, PageID 1049.)

Plaintiff immediately challenged the RIB findings but on May 20, AA Greene initially affirmed all three rule violations. (Doc. 60, PageID 537.) On May 28, Plaintiff filed a formal appeal to Warden Morgan. (*Id.*) On the same date, but allegedly without notifying Plaintiff at that time, AA Greene reconsidered and modified the disposition by setting aside the convictions for violations of Rules 1 and 3 based upon "[i]nsufficient evidence." (*Id.*, PageID 537-38.) He did find "some evidence to support a rule 20

---

[16]The date of any such hearing remains unclear. Initially Defendants' responses indicated that Plaintiff's security rating was not changed. Correcting their initial response, Defendants do not suggest that the change from 4A to 4B did not require a hearing but instead insist Plaintiff waived his appearance.

[violation] and it is affirmed." (*Id.*, PageID 538.) When Plaintiff eventually learned of the Warden's decision affirming the Rule 20 conviction, he appealed that remaining conviction as well as penalties imposed to ODRC Director Gary Mohr. (*Id.*) Director Mohr (who is not a Defendant herein) affirmed the modified decision on June 26, 2013, the same date that Plaintiff alleges he was transferred to OSP.  (*Id.,* PageID 567.)

On June 5, 2013, Plaintiff alleges that then-Warden Morgan stopped to visit Plaintiff while he was still housed in segregation. (Doc. 3, PageID 74.)  Defendant Morgan allegedly informed Plaintiff he had reviewed the video, and told Plaintiff that his RIB case was still being investigated (with no mention of his/Greene's May 28 "modification"), but that for Plaintiff's "safety he will be transferred to (OSP) and when all the paperwork catches up," his "security will be lowered to a Level #3 Close Security status, and he will be transferred from (OSP). So just relax." (*Id.*; *see also* Doc. 69-1, PageID 1048, stating that Greene told Plaintiff he was being transferred for "safety and security reasons"; PageID 1049, averring that Morgan stated he was being "transferred out to OSP to prevent staff or inmates from retaliating against me.")

In contrast to Plaintiff's account, Defendants assert that "for apparent reasons of his own, Inmate Spencer requested a transfer" to OSP, which transfer took place on June 26, 2013. (Doc. 60-3, PageID 568.)  Plaintiff denies requesting any such "voluntary" transfer other than in July 2008, when he requested a transfer to be closer to his terminally ill father. (Doc. 69-1, PageID 1018.)  Plaintiff asserts that Defendants ignored that request for years, until Defendants used his stale request to claim that his June 2013 transfer was in accordance with Plaintiff's "voluntary" request. (*Id.*, PageID 994.)

On June 14, 2013, an administrator "brought the Plaintiff Mental Health papers

and a clearance form for transfer to (OSP)." (Doc. 3,  PageID 74; *see also* Doc. 69-1, PageID 1050.)  A form dated the same date prepared by Defendant Morgan reflects an "administrative" request to transfer Plaintiff based upon a "voluntary transfer from SOCF 4B to OSP Level 4B." (Doc. 60-3, PageID 568.) On June 18, 2013, the "administrative" transfer was approved by non-defendant BOC Chief Rob Jeffreys, who noted that Plaintiff was a "volunteer." (*Id.*, PageID 539.)

In connection with the June 14 paperwork, Plaintiff was served with a "Notice of Hearing" that reflected the "Proposed Administrative Transfer" and stated: "[T]he transfer will not change your current Level 4B security classification status."[17] (*Id.*) The form is silent as to the reason for transfer other than "to enhance the effectiveness and efficiency of institutional operations." (*Id.*, PageID 569-70.)  The form further states:  "If the inmate consents to the proposed transfer, no hearing shall be held.  The inmate shall be transferred." (*Id.*, PageID 569.)  Under "inmate signature" appears the hand-printed last name "Spencer" along with two "X's" indicating "I wish to waive my right to attend the hearing" and "I consent to the transfer." (*Id.*, PageID 570.)

The written name "Spencer" on the transfer form differs slightly from Plaintiff's handwritten or printed signature on other documents of record.  (*Compare* Doc. 60-3 PageID 570 *with e.g.*, Doc. 60-2, PageID 563-64; Doc. 68-1; Doc. 69-1, PageID 1052.) Nevertheless, Plaintiff admits that he "did sign transfer papers to OSP" when presented with papers one day prior to his transfer. (Doc. 69, PageID 994.)

Plaintiff explains the circumstances of his consent as follows.  On June 25, 2013, Plaintiff alleges he met with Defendant AA Greene for the first time since the May 14 incident. (Doc. 3, PageID 75 ¶ 36.)      AA Greene allegedly showed Plaintiff a "blank

---

[17]Though the precise date of the change from 4A to 4B remains unclear, it was apparently after the RIB conviction but on or before June 14, 2013.

DRC 4374 Decision form," and informed Plaintiff—consistent with Defendant Morgan's prior remarks—that he "had reviewed all the [video] evidence on the DVR 196-13 and received a recanted statement from the charging officer." *(Id.*, ¶ 37.) Allegedly without informing Plaintiff of the now-month-old "Modified" decision, AA Greene checked the "Reversed" box on the form and informed Plaintiff that after his transfer to OSP was completed, "the charges would be dropped and his status would be dropped to a level 3 Security and he would be transferred from there [OSP]." (*Id.*, ¶ 38; *see also* Doc. 69-1, PageID 999.) Greene admits initially checking the "Reversed" box and showing that version of the form when he met with Plaintiff in his cell, but insists that was an inadvertent administrative error that he discovered upon returning to his office, prior to typing up the final decision. (Doc. 60-4, PageID 573-74.) Greene does not indicate the date on which he met with Plaintiff, but the typed "Modified" decision is dated May 28, 2013.

Plaintiff asserts that he agreed to the transfer to OSP only after being told that he was being transferred for his safety, that all disciplinary charges would be reversed, that his security classification would not increase but instead would decrease to Level 3, and that it would be only a "temporary transfer." (Doc. 69, PageID 994-95.) The undersigned finds a genuine dispute as to the material facts surrounding Plaintiff's transfer to OSP. Plaintiff alleges that he was coerced into the "voluntary" transfer to OSP by being "deceived" and through "trickery." (Doc. 69, PageID 985-86.) He specifically alleges that Defendants persuaded him to sign transfer papers through false representations. Correspondence from Plaintiff's then-attorney to Plaintiff confirms the same understanding. (Doc. 69-1, PageID 1031.) Plaintiff also has put forth some evidence that he may have been denied the opportunity to appear at a classification

hearing, and that he was never notified of his security classification change from 4A to 4B until long after his transfer to OSP. (Doc. 69-1, PageID 1051.)

Plaintiff asserts that the language used to support the vacated Rule 1 and Rule 3 violations was "used to justify his [security] status upgrade and transfer." (See Doc. 69-1, PageID, 1050-51.) He alleges that Defendant Greene falsely informed OSP that he was a "4B months before the May 14, 2013 incident," rather than acknowledging (as Defendants now concede) that the change to 4B occurred after the May 14 incident. (*Id.*) As noted, Greene's initial discovery response incorrectly denied any change and stated that "any security increase would not have been possible due to the Rule 1 and Rule 3 convictions by the SOCF RIB because I vacated those convictions." (Doc. 60-4, PageID 577.)[18]

On March 21, 2014, after 9 months at OSP, Plaintiff was recommended for an administrative transfer from OSP to the Toledo Correctional Institution, having attained a reduction in his security classification from 4B back to the his prior 4A classification. (Doc. 60, PageID 540-41.) In November 2015, he was transferred back to SOCF, where Defendants represent in their motion that his security classification already has been further reduced to a Level 3. (*Id.*, PageID 546.) However, in a May 2016 motion seeking preliminary injunctive relief in order to avoid alleged retaliation by Defendants and other SOCF staff, Plaintiff seeks transfer away from SOCF for a period of seven months, until he attains his still-anticipated Level 3 classification and is transferred to a work camp. (Doc. 75, PageID 1339.)

## 2. Eleventh Amendment Immunity for Official Capacity Claims for Monetary Damages

---

[18] Defendants now contend that the affirmance of the Rule 20 violation alone was sufficient to uphold all of the original penalties, including the change to Plaintiff's privilege classification. (Doc. 60-2, PageID 566, Warden's modified decision of 5/28/13, vacating rule 1 and rule 3 violations, but stating "All penalties imposed by RIB are authorized.").

Just as the Eleventh Amendment provides the basis for judgment in favor of Defendants Baker and Anderson in their official capacities, so too does the same immunity bar Plaintiff's claims for monetary damages against Defendants Morgan and Greene in their official capacities.  Thus, Defendants Morgan and Greene are entitled to partial summary judgment.

### 3. Due Process Claims Against Defendants Morgan and Greene

Defendants argue that they also are entitled to summary judgment on Plaintiff's due process claims against them in their individual capacities.  However, the undersigned finds that genuine disputes of material fact preclude the grant of summary judgment on those claims.

Because the record confirms that Plaintiff's security classification was never increased to a Level 5, and Plaintiff admits to signing transfer papers to OSP, Defendants maintain that Plaintiff was transferred to OSP at his own request. (Doc. 60, PageID 544-45.)  However, disputes remain concerning whether Plaintiff freely and voluntarily waived his due process rights: (1) for 48 hours' notice and the ability to attend any hearing wherein his classification was changed from 4A to 4B; and (2) for his transfer to OSP.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court held that inmates have a protected liberty interest in avoiding assignment at OSP.  The Court held that based on that liberty interest, inmates are entitled to due process protections prior to any transfer to OSP, because the conditions of confinement at the Supermax facility constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*, at 223, quoting *Sandin v. Connor*, 515 U.S. 472, 484 (1995). In a unanimous opinion, the Court explained:

In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

Aside from the severity of the conditions, placement at OSP is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he may be incarcerated at OSP once assigned there. *Austin I, supra,* at 740. Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP. 189 F.Supp.2d, at 728.

*Wilkinson v. Austin*, 545 U.S. at 214-15, 125 S. Ct. at 2389.

The undersigned previously construed Plaintiff's claim against Defendants Morgan and Greene as "a due process claim…in connection with his RIB proceeding and his OSP transfer," specifically citing *Wilkinson* and the recognition that OSP was a "supermax" prison that impinges upon an inmate's liberty interest.  (Doc. 4, PageID 125.)  Defendants seek to avoid the impact of *Wilkinson* by asserting that Plaintiff expressly waived due process protections by requesting a transfer. On the record presented, however, issues remain as to whether Plaintiff's waiver was voluntary or coerced.

Defendants alternatively argue that even if Plaintiff's account of Defendants' meetings with him is true, "those representations actually came to pass exactly as Inmate Spencer described…: Inmate Spencer was eventually lowered to Level 3

security classification and was transferred from OSP to ToCI."  (Doc. 60, PageID 546.)
It is not entirely clear that Plaintiff already has been reduced to a Level 3 status, but
even if true, Defendant's argument does not preclude Plaintiff's due process claim.

Defendants also alternatively argue that Plaintiff has failed to specifically plead
that he was in fact subjected to the type of "highly restrictive conditions" described in
*Wilkinson.*  Plaintiff asserts he was reclassified as a "4B" and placed on the "death row"
block. (Doc. 69, PageID 980.)  He also has attached copies of multiple letters to his
attorney during his confinement at OSP in which Plaintiff states that he has been on
disciplinary lock down for extended periods, and subjected to highly restrictive
conditions, as well as correspondence from the Correctional Institution Inspection
Committee that references his confinement in segregation at OSP "being locked down
23 hours per day."  (Doc. 69-1, PageID 1009-15, 1038; *see also* Doc. 3-1, PageID 81,
attorney correspondence.)

The undersigned found on initial screening that Plaintiff had stated a non-
frivolous due process claim under *Wilkinson*.  It remains the Defendants' burden as the
moving party to offer some evidence that Plaintiff did not suffer atypical *Wilkinson*-style
conditions during the nine months he was housed at OSP.   Defendants have offered no
evidence at all that would suggest that the conditions experienced by Plaintiff while
housed at OSP were less restrictive than those described by the *Wilkinson* Court.

### 4.  Qualified Immunity

Unlike Defendants Baker and Anderson, the undersigned further concludes that
Defendants Morgan and Greene are not entitled to qualified immunity when all disputed
facts and reasonable inferences are drawn in Plaintiff's favor.  Under those construed
facts, Defendants should have known that they were violating Plaintiff's due process

rights by preventing him from attending a classification hearing, falsifying waiver documents, and/or by coercing Plaintiff to agree to a "voluntary" transfer to OSP based upon false promises and misrepresentations.

### C.  Motion for Summary Judgment by Remaining Defendants

A third motion for summary judgment was filed on March 9, 2016, by the four remaining Defendants: Corrections Officers Melissa Campbell, Matthew Chaffin, Michael Jenkins, and Shawn Miller.  As with the motion of Defendants Greene and Morgan, I recommend that the motion of these four Defendants be granted only in part.

### 1.  Undisputed Facts Relating to Defendants Campbell, Chaffin, Jenkins and Miller

When Baker summoned emergency assistance, a total of fourteen SOCF personnel responded, including Defendants Campbell, Chaffin, Jenkins, and Miller. (Doc 62, PageID 607.) The latter three all reported using force to restrain Plaintiff, as did non-party Correctional Officer Stiles. (*Id.*)  Officer Campbell reported only witnessing others' use of force.  (*Id.*)

Officers Miller and Stiles were the first responders and observed an unrestrained inmate (Plaintiff) standing over a then-prone Anderson, who was "apparently defenseless." (*Id.*)  Plaintiff admittedly pushed Anderson's PR-24 away from him to prevent him from regaining control over it, and Plaintiff admittedly placed his hands at Anderson's neck/shoulders area to prevent Anderson from getting back to his feet. (*Id.*, PageID 607-08.)  Spencer also admitted that he did not immediately step away from Anderson as directed.  Miller deployed Oleoresin Capsicum ("OC" or "pepper spray") but Spencer—at least momentarily in the fluid situation—remained in place. (*Id.*)

Defendants assert that Plaintiff resisted Miller and Stiles' efforts to apply handcuffs, and continued to resist being cuffed when a third officer (Chaffin) arrived, so

the officers took him to the ground to restrain him. (*Id.*)  During the struggle, which lasted more than 2 minutes, Defendants contend that Spencer unsuccessfully attempted to bite Officer Chaffin's right arm. (*Id.*, PageID 609.) Plaintiff denies struggling to prevent officers from cuffing him, and denies trying to bite Chaffin. (*See* Doc. 70, PageID 1110.)  However, he does not deny the initial facts that led to the use of OC spray (that he stood over Anderson, prevented him from getting to his feet, failed to move away from Anderson, and pushed Anderson's PR-24 away).  Plaintiff also stated in a May 30 interview by the Use of Force Committee:  "I believe the responding officers did what they felt was necessary to restore order."  (Doc. 62-2, PageID 626, 657.) When additional officers arrived, they were directed not to proceed up the stairs because other officers were already engaged. (Doc. 62, PageID 608-09.)  Officer Campbell did proceed up the stairs, but did not engage in securing Plaintiff. (*Id.*, 609.)

At the end of the initial struggle, Plaintiff was restrained in cuffs, ceased physically resisting, had been escorted to his feet and was then escorted down the stairs.  Defendants assert that Spencer at first exhibited only "slight" resistance to being escorted, such that Miller, Stiles, and Chaffin used only "basic escort techniques."  (*Id.*, *citing e.g.*, Doc. 62-11, PageID 761.)  Since Milller had been exposed to the OC spray, Defendant Jenkins took over escort duty once in the bullpen. (*Id.*) At the L-Side Corridor, Defendants contend that Plaintiff escalated his resistance by dragging his feet and dropping his weight, requiring Defendants Chaffin and Jenkins to employ an advanced escort technique by deploying PR-24 batons between Plaintiff's wrists.  (Doc. 62-8, PageID 745, "It was …necessary for both of us to deploy our PR-24's to overcome Inmate Spencer's resistance to continuing with the escort and to provide some distance between us to protect us from blood, chemicals, or any other contaminants that we may

37

have come into contact with"; *see also* Doc. 62-10, PageID 758 "Once [Plaintiff was in the Corridor refusing to walk…a PR-24 escorting technique was then employed so it would be easier for the Officers to gain [Plaintiff's] compliance to walk under his own power."; Doc. 62-12, PageID 771-72.)  Officer Jenkins states that during the hallway escort when greater force was used, Chaffin secured Plaintiff's right arm and wrist while he secured his left arm and wrist using their PR-24 batons. (Doc. 62-11, PageID 767.) He states that Campbell "assisted me with the placement of my PR-24 during Inmate Spencer's escort." (*Id.*)

Arguably inconsistently, Defendant Chaffin's account also states: "Once Inmate Spencer was restrained in handcuffs he presented no harm to himself or anyone else and so no other force was used, or witnessed, as [Plaintiff] no longer needed to be controlled."  (Doc. 62-8, PageID 746.)  No video was retained of the L-side hallway where Defendants admittedly used their PR-24 batons as part of their escort technique, or of subsequent events at the Infirmary.

Defendants allege that Plaintiff complained of difficulty breathing and chest pains once he arrived at Control Center 3—a fact that Plaintiff himself strongly denies and alleges was fabricated by Defendants.  (*See, e.g.*, Defendants' accounts at Doc. 62-7, PageID 732, 740 (chest pains and trouble breathing); Doc. 62-8, PageID 745 (difficulty breathing and chest pains), Doc. 62-10, PageID 758 (trouble breathing); Doc. 62-12, PageID 772 (chest pains).)  Defendants located a wheelchair, secured Plaintiff to it, and took Plaintiff to the Infirmary rather than taking him immediately to segregation.  (Doc. 18, PageID 185 ¶ 35.)[19]

At the Infirmary, Defendants Chaffin, Jenkins, and Campbell remained with

---

[19] Defendants' Answer admits they "secured [Plaintiff] to a wheelchair," but Defendants deny handcuffing Plaintiff to the wheelchair. ( Doc. 62-8,PageID 745 ¶ 14, Chaffin affidavit.)

Plaintiff. (Doc. 62, PageID 610.)  Plaintiff alleges that all three employed excessive force against him while he was there. (*See* Doc. 70, PageID 1111.)  All officers deny the allegations that Plaintiff was struck with PR-24 blows to his head and face, that he was elbowed in the left side of his face and ear by Campbell, that PR-24 batons were placed around his neck, or used at all against him during his escort after he was seated in the wheelchair, en route to the Infirmary, with the exception of the use of PR-24 escort techniques used by Defendants Chaffin and Jenkins prior to reaching Control Center 3. (Doc. 63, PageID 611.)  All four Defendants further deny making any threats and/or using racial slurs.  (*Id.*)

Eventually, Plaintiff was examined by Nurse Jenkins, who was voluntarily dismissed by Plaintiff from this lawsuit.  There is no reference in the medical report to chest pains, although Defendant Jenkins avers Plaintiff was "being checked by Medical staff for chest pains and other possible injuries." (Doc. 62-12, PageID 772.)  Defendants deny the existence of "significant visible injuries," noting that incident reports reflect "force that would not be expected to produce visible injuries" and denying the use of any other force.  (*See, e.g.*, Doc. 62-8, PageID 746.)  The Use of Force Investigation concluded that the officers did not use excessive force.  (Doc. 62-2.)

Nurse Jenkins documented:  "Minor abrasions top of head.  No Bleeding (red pigmentation). Left arm with minor bleeding noted.  Speech clear and ambulated well. Orange substance to head and neck, respirations 20, full range of motion pain level 2 out of 10, oxygen levels 100%." (Doc. 62-2, PageID 681.)  Nurse Jenkins' notes further reflect that Plaintiff's arm was cleaned, he refused Tylenol or Motrin, and was advised to follow up with sick call if needed. (*Id.*)  Plaintiff was housed in K-2 (segregation) at 9:21 pm.  Defendants allege that Plaintiff was offered a shower, a fact that Plaintiff denies.

(Doc. 62-2, PageID 634.)

### 2. Official Capacity Claims

Plaintiff's claims for monetary damages against these four Defendants in their official capacities must be dismissed.  For the reasons previously discussed, Defendants Campbell, Chaffin, Jenkins, and Miller are entitled to immunity under the Eleventh Amendment for all claims for monetary damages brought against them in their official capacities.

### 3. Qualified Immunity Defense

Defendants argue that they are entitled to qualified immunity for Plaintiff's excessive force claims against them in their individual capacities, because they employed only limited and isolated force that was "arguably de minimis," and that produced only de minimis injury or pain.   Defendants argue that Plaintiff can produce no evidence to support his version of the facts, citing *Marbury v. Hicks*, 2010 WL 3075087 (N.D. Ohio Aug. 5, 2010).  In that case, however, the plaintiff did "not dispute the Defendants' version of the facts," which included an acknowledgement that the plaintiff became violent and elbowed an officer in the face after being handcuffed, and that the cuffed inmate was extremely violent "twisting his body and throwing himself around, like a 'raging bull.'"  *Id.* at *9.  Here, by contrast, Plaintiff strongly disputes Defendants' account that he exhibited any physical resistance *after* being handcuffed.

The undersigned agrees that Defendants are entitled to judgment in their favor on qualified immunity grounds up until the time that Plaintiff was restrained in handcuffs. The entirety of that initial display of force is captured, albeit poorly, on the lone video record that shows the Defendants' use of pepper spray and taking Plaintiff to the ground in order to handcuff him.   However, the undersigned cannot agree that Defendants are

entitled to qualified immunity for events that allegedly occurred in the L-side hallway and Infirmary.

Defendants argue that the record evidence demonstrates only "minor de minimis injuries" with no injuries consistent with Plaintiff's account of being subjected to the use of PR-24 baton strikes to his head and/or face either in the hallway or in the Infirmary. While "[a] de minimis use of force will not support an actionable claim, …a plaintiff may recover even if he suffers only minor injury." *Hudson v. McMillian* 503 U.S. 1 (1992). Here, Plaintiff alleges he suffered nerve damage in his left wrist, a "busted ear drum" and other injuries.  (Doc. 44, PageID 330.)  As such, Defendants concede that Plaintiff has at least arguably alleged non de minimis injury.  Although Defendants maintain that their actions resulted in no injury, (*see* Doc. 62, PageID 621), the undersigned finds genuine disputes of material fact preclude summary judgment.

Defendants also argue that given that prison officials "'must make their decisions in haste, under pressure, and frequently without the luxury of a second chance,' we must grant them 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Combs v. Wilkinson*, 315 F.3d 548 at 557 (6th Cir. 2002) (quoting *Hudson*, 503 U.S. at 6).  This analysis controls the Court's view of the initial altercation.  That altercation was so fluid, and the force used so minimal under the circumstances, that even if Plaintiff's account is believed—that he placidly held out both arms to be cuffed and did not attempt to bite Officer Chaffin—the Defendants' use of OC spray and taking Plaintiff to the ground were still objectively reasonable.  However, it is not the initial altercation that is most disputed, but subsequent events.

Defendants continue to argue that "[t]he incidents that occurred during Inmate

41

Spencer's escort from Control Center 3 to the Infirmary and during his stay therein, were brought upon by Inmate Spencer's own voluntary actions *in violating prison rules once he had been taken into custody*."  (Doc. 62 at 20, emphasis added.)  The Defendants' position arguably is inconsistent with the contention that nothing happened in the L-side hallway or in the Infirmary.  In addition, Plaintiff was convicted of violating only one prison rule—his failure to comply with Defendant Anderson's initial order to proceed into the shower when still on the range.  The record presently before the undersigned does not reflect any additional charges or convictions for "violating prison rules once he had been taken into custody" after the initial altercation on May 14.

Defendants' account, in which they claim they did nothing to violate Plaintiff's Eighth Amendment rights in the hallway or infirmary, ultimately may be accepted by a factfinder at trial.  However, Plaintiff has put forth sufficient evidence at this juncture that the undersigned finds genuine disputes of material fact preclude summary judgment.

### V.  Conclusion and Recommendations

For the reasons discussed herein, **IT IS RECOMMENDED THAT**:

1.  Plaintiff's first motion for preliminary injunctive relief (Doc. 65) be **DENIED;**

2.  The motion of Defendants Baker and Anderson for summary judgment (Doc. 57) be GRANTED in full, and those two Defendants be dismissed;

3.  The motion of Defendants Greene and Morgan for summary judgment (Doc. 60) be GRANTED in part, with judgment granted in Defendants' favor as to Plaintiff's claims for monetary damages against the Defendants in their official capacities, but otherwise denied;

4.  The motion of Defendants Campbell, Chaffin, Jenkins, and Miller for summary judgment (Doc. 62) be GRANTED in part, with judgment granted in

Defendants' favor as to Plaintiff's claims for monetary damages against the four referenced Defendants in their official capacities.  In addition, Defendants are entitled to summary judgment on Plaintiff's claims against them in their official capacities up to the point at which Plaintiff was restrained in handcuffs during the May 14, 2013 incident.  However, the undersigned recommends that summary judgment otherwise be denied based upon the existence of genuine and material factual disputes.


*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JERMAINE SPENCER,

      Plaintiff,

        v.

DONALD MORGAN, et al.,

      Defendants.

Case No. 1:14-cv-696

Barrett, J.
Bowman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN  (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).